No. 18-3329

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

PRETERM-CLEVELAND, ET AL.,

        Plaintiffs-Appellees,

v.

AMY ACTON, ET AL.,

        Defendants-Appellants.

:
:
:
:
:
:
:
:

On Appeal from the
United States District Court
for the Southern District of Ohio
Western Division

District Court Case No.
1:18-cv-00109

---

## APPELLANTS' PETITION FOR REHEARING AND
## REHEARING *EN BANC*

---

DAVE YOST
Ohio Attorney General

BENJAMIN M. FLOWERS*
Ohio Solicitor General
  *Counsel of Record*
STEPHEN P. CARNEY
Deputy Solicitor General
TIFFANY L. CARWILE
Assistant Attorney General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614-466-8980
bflowers@ohioattorneygeneral.gov

*Counsel for Defendants-Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................ii

RULE 35(b) STATEMENT AND INTRODUCTION ........................................ 1

BACKGROUND......................................................................................................4

      A.    Ohio's Antidiscrimination Law. ..................................................4

      B.    The Sixth Circuit affirmed the District Court's order preliminarily enjoining Ohio's Antidiscrimination Law.............9

ARGUMENT........................................................................................................ 11

    I.    The panel majority contradicted Supreme Court precedent when it invalidated Ohio's Antidiscrimination Law.................................. 11

    II.    The question whether Ohio can regulate eugenic abortions is of exceptional importance. ................................................................... 16

CONCLUSION.................................................................................................... 18

CERTIFICATE OF COMPLIANCE ................................................................. 19

CERTIFICATE OF SERVICE .......................................................................... 20

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Box v. Planned Parenthood of Ind. & Ky., Inc.*,
    139 S. Ct. 1780 (2019) .................................................................*passim*

*Buck v. Bell*,
    274 U.S. 200 (1927) .........................................................................4

*EMW Women's Surgical Ctr. v. Meier*,
    No. 3:19-cv-00178-DJH (W.D. Ky) ................................................4

*Gonzales v. Carhart*,
    550 U.S. 124 (2007) .......................................................... 11, 12, 14

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997).............................................................. 13

*Obergefell v. Hodges*,
    135 S. Ct. 2584 (2015) ................................................... 17

*Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of the Ind. State Dep't
of Health*,
    917 F.3d 532 (7th Cir. 2018) ............................................ 3, 4, 15, 17

*Planned Parenthood of Indiana and Kentucky, Inc. v. Comm'r of the Ind.
State Dep't of Health*,
    888 F.3d 300 (7th Cir. 2018) .......................................... 15

*Planned Parenthood of Southeastern Pa. v. Casey*,
    505 U.S. 833 (1992).................................................................*passim*

*Plessy v. Ferguson*,
    163 U.S. 537 (1896) ...................................................... 17

**Statutes and Rules**

Fed. R. App. P. 35 .............................................................................1, 2

Ky. Rev. Stat. §311.731................................................................4

Ohio Rev. Code §2919.10.....................................................................4, 5

Ohio Rev. Code §2919.101.....................................................................4

Ohio Rev. Code §3701.79.......................................................................4

**Other Authorities**

A. Lee et al., *Ethical Public Health: More than Just Numbers*, 144 Public
Health A1 (2017)...................................................................................7

Brian G. Skotko et al., *Self-Perceptions From People With Down
Syndrome*, 155 Am. J. Med. Genet. Part A 2360 (2011) ......................7

Jeffrey S. Sutton, *51 Imperfect Solutions* (2018) .................................3

John Bingham, *Richard Dawkins: 'Immoral' to Allow Down's Syndrome
Babies to Be Born*, The Telegraph, Aug. 20, 2014 ...............................6

Julian Quinones & Arijeta Lajka, *"What Kind of Society Do You Want
to Live in?": Inside the Country Where Down Syndrome Is
Disappearing*, CBS News, Aug. 14, 2017...............................................5

Karen L. Lawson et al., *The Portrayal of Down Syndrome in Prenatal
Screening Information Pamphlets*, 34 J. Obstet. Gynaecol. Can. 760
(2012) ....................................................................................................6

Laura E. Holt, *Parental Opinions About Prenatal Genetic Screening and
Selective Abortion for Down Syndrome* (May 2017) .............................7

Linda L. McCabe & Edward R.B. McCabe, *Down Syndrome: Coercion
and Eugenics,* 13 Genetics in Medicine 708 (2011) .............................7

Renate Lindeman, *A Moral Duty to Abort*, Huffington Post, Sept. 21,
2017 ...................................................................................................5, 6

Renate Lindeman, *UN Human Rights Committee: Stop Equating Life
with a Disability to Suffering*, Huffington Post, Nov. 9, 2017 ...............6

## RULE 35(B) STATEMENT AND INTRODUCTION

This case presents the question whether laws prohibiting doctors from knowingly participating in eugenic abortions are categorically unconstitutional. In other words, are these laws unconstitutional *without regard* to whether, and to what extent, they burden the right to an abortion? According to the panel majority, the answer is "yes." As a result, it struck down Ohio's "Antidiscrimination Law"—a law prohibiting doctors from performing abortions that they *know* their patients want because of a prenatal diagnosis or indication of Down syndrome—without even considering the state interests the law promotes or the burdens it imposes. This Court should rehear this case *en banc*, because "the panel decision conflicts with a decision of the United States Supreme Court," and because it involves issues of "exceptional importance." Fed. R. App. P. 35(b)(1)(A) & (B).

Doctrinally, the panel majority erred when it concluded that the right to a pre-viability abortion is "categorical." Op.6. In fact, the constitutionality of an abortion regulation turns on whether its "purpose or effect is to place a *substantial obstacle* in the path of a woman seeking an abortion before the fetus attains viability." *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 878 (1992) (plurality) (emphasis added). This flexible test acknowledges that a restriction on the right to obtain a pre-viability abortion *is not* automatically unconstitutional. The

1

right, in other words, is not categorical. Indeed, *Casey* itself upheld a law prohibiting minors from getting abortions without parental consent or court approval—that is, a law that *banned* those who could obtain neither consent nor court approval from getting an abortion. *Id.* at 899 (plurality); *id.* at 970 (Rehnquist, C.J., concurring in judgment, in part). If the right were "categorical," then this complete ban on a class of abortions would have been invalidated.

But the real reason for *en banc* review is the "exceptional importance" of the question whether States can pass anti-eugenics laws. Fed. R. App. P. 35(b)(1)(B). These laws further two critically important state interests.

First, anti-eugenics laws protect the dignity of people living with conditions or traits targeted for abortion. When society pursues the eradication of unborn children exhibiting a particular trait, it sends a message that people living with that trait are not as valuable as others. Today, one of the most commonly targeted traits is Down syndrome. In America, *two-thirds* of unborn children diagnosed with Down syndrome are aborted. Other Western countries—including Iceland and France—proudly boast about almost exterminating the Down syndrome population. *See* Op.10 & n.1 (Batchelder, J., dissenting). The practice of targeting unborn children with Down syndrome for abortion devalues the lives of people living with

Down syndrome. The panel's holding thus categorically prohibits the State from regulating a practice that devalues the lives of vulnerable citizens.

Second, anti-eugenics laws are necessary because eugenic abortions "do deep damage to the integrity of the medical profession." Op.11 (Batchelder, J., dissenting). Humans are not show dogs or racehorses. No traits are ideal, and no one has "the 'wrong' sex or race." *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of the Ind. State Dep't of Health*, 917 F.3d 532, 536 (7th Cir. 2018) (Easterbrook, J., dissenting from denial of rehearing *en banc*), *rev'd in part sub nom.*, *Box v. Planned Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780 (2019). Every human life matters—certainly the people of Ohio may enact laws reflecting that view—and the medical profession must never again be associated with a contrary view. In the early twentieth century, elite medical opinion actively promoted eugenic "solutions" to intellectual disabilities and other health issues. *See* Jeffrey S. Sutton, *51 Imperfect Solutions* 87–91 (2018); *Box*, 139 S. Ct. at 1784–87 (2019) (Thomas, J., concurring). Unless something is done, the medical profession may once again exhibit a cozy relationship with eugenic goals. Health authorities here and abroad are facilitating at best, and promoting at worst, the eradication of "undesirable" traits. The panel's decision keeps the States from acting to counteract this.

As Judge Batchelder recognized in dissent, one hears in this case "the distant echo of the sorry case of *Buck v. Bell*, 274 U.S. 200, 207 (1927)"—the decision in which the Supreme Court infamously upheld a state law allowing forced sterilization of the mentally disabled. Op.10 (Batchelder, J., dissenting). Indeed, the panel's decision is worse than *Buck v. Bell* in one important respect: whereas *Buck* at least left the States free *not to* pursue or promote eugenic policies, the panel's decision *requires* the States to sit idly by while eugenic practices reemerge. The panel's decision thus removes this important question from the democratic process in every State in the Sixth Circuit—including not just Ohio, but also Kentucky, which has a similar anti-eugenics law that is now being challenged. *See* Ky. Rev. Stat. §311.731; *EMW Women's Surgical Ctr. v. Meier*, No. 3:19-cv-00178-DJH (W.D. Ky).

It need not be this way. "None of the [Supreme] Court's abortion decisions holds that states are powerless to prevent abortions designed to choose the sex, race, and other attributes of children." *Planned Parenthood of Ind. & Ky.*, 917 F.3d at 536 (Easterbrook, J., dissenting from denial of rehearing *en banc*). The full Court should step in and say so.

## BACKGROUND

### A.   Ohio's Antidiscrimination Law.

In 2017, Ohio passed the "Antidiscrimination Law." Ohio Rev. Code §§2919.10, 2919.101, 3701.79. The law prohibits medical providers from

intentionally performing or inducing an abortion if they have "knowledge that the pregnant woman is seeking the abortion, in whole or in part, because of" Down syndrome. Ohio Rev. Code §2919.10(B).

Ohio enacted the Antidiscrimination Law in response to a modern eugenics trend targeting Down syndrome. The trend is perhaps most pronounced in Western Europe. The Dutch government, for example, aggressively markets prenatal testing as a means to "end" Down syndrome; the country's National Institute for Public Health and the Environment even aids a television series called "The Last Downer." Renate Lindeman, *A Moral Duty to Abort*, Huffington Post, Sept. 21, 2017, R.25-1, PageID#160. Iceland is reportedly "close to eradicating Down syndrome births." Julian Quinones & Arijeta Lajka, *"What Kind of Society Do You Want to Live in?": Inside the Country Where Down Syndrome Is Disappearing*, CBS News, Aug. 14, 2017, R.25-2, PageID#382. "Other countries aren't lagging too far behind." *Id.* In America, for example, two-thirds of unborn children diagnosed with Down syndrome are aborted. *Box v. Planned Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780, 1790–91 (2019) (Thomas, J., concurring).

The eugenic impulse arises in elite academic circles, where ethicists argue that mothers have a *duty*, not simply an option, to abort children with Down syndrome. An Oxford professor advocated that, after a prenatal diagnosis of Down

syndrome, parents have "an ethical responsibility to 'abort it and try again.'" John Bingham, *Richard Dawkins: 'Immoral' to Allow Down's Syndrome Babies to Be Born*, The Telegraph, Aug. 20, 2014, R.25-2, PageID#403. In a debate before the United Nations Human Rights Committee, one nation's representative declared that helping "disabled people once they are born … doesn't mean that we have to … allow a fetus suffering with impairment to live." Renate Lindeman, *UN Human Rights Committee: Stop Equating Life with a Disability to Suffering*, Huffington Post, Nov. 9, 2017, R.25-2, PageID#407 (citation omitted). And a professor of medical ethics contends that, "morally," parents who decline prenatal testing should "be held amenable [sic] for their choice." Lindeman, *A Moral Duty to Abort*, R.25-1, PageID#161.

These views have gained a foothold in the medical community. Many families report that, after a potential fetal Down syndrome diagnosis, counseling often includes subtle or overt pressure to abort. *See, e.g.*, Keough Decl. ¶9, R.25-1, PageID#178. Often, "descriptive" materials are imbalanced in stressing only perceived negatives. For example, a study of pamphlets from Canadian prenatal screening centers and clinics found that only 2.4 percent "of the extracted sentences were categorized as conveying a positive message about" Down syndrome. Karen L. Lawson et al., *The Portrayal of Down Syndrome in Prenatal*

*Screening Information Pamphlets*, 34 J. Obstet. Gynaecol. Can. 760, 762, 764 (2012), R.25-2, PageID#395, 397. Other materials are not so descriptive at all. For example, one California prenatal screening program has "described [Down syndrome] pregnancies that are continued as 'missed opportunities.'" Linda L. McCabe & Edward R.B. McCabe, *Down Syndrome: Coercion and Eugenics,* 13 Genetics in Medicine 708, 709 (2011), R.25-2, PageID#387.

This discriminatory trend cannot be justified with reference to the unborn child's expected quality of life. Most individuals with Down syndrome report positive self-esteem and happiness. In one survey, 99 percent felt happy with their lives, 97 percent liked who they were, and 86 percent said they could make friends easily. Brian G. Skotko et al., *Self-Perceptions From People With Down Syndrome*, 155 Am. J. Med. Genet. Part A 2360, 2360 (2011), R.25-1, PageID#196. Healthcare advances have extended the average life expectancy for children born with Down syndrome from nine years in 1929 to over sixty years today. A. Lee et al., *Ethical Public Health: More than Just Numbers*, 144 Public Health A1, A1 (2017), R.25-1, PageID#207. Many individuals with Down syndrome have gainful employment and active social lives. They marry and live independently.

Families echo this positive outlook. *See* Laura E. Holt, *Parental Opinions About Prenatal Genetic Screening and Selective Abortion for Down Syndrome* 8 (May

2017) (unpublished M.A. thesis, Univ. of Louisville) (on file with Univ. of Louisville's Inst'l Repository.), R.25-1, PageID#226; Kuhns Decl. ¶5, R.25-1, PageID#186; Scheid Decl. ¶¶11-12, R.25-1, PageID#182; Gill Decl. ¶¶4, 5, R.25-2, PageID#75; Fernandes Decl. ¶15, R.25-1, PageID#171 (quoting Skotko et al., *Having a Brother or Sister With Down Syndrome: Perspectives From Siblings*, 155 Am. J. Med. Genet. A 2348, 2348 (2011)).

This push to eradicate Down syndrome sends a brutal message: the lives of people with Down syndrome are not as valuable as other lives. If they were, it would be impossible to explain why foreign governments, medical ethicists, and medical professionals promote or subtly encourage the eradication of Down syndrome. The only possible takeaway is that people with Down syndrome are less deserving of life. These views, if not counteracted, seep into society generally, harming those living with Down syndrome and the people who love them. And to the extent the push works—to the extent fewer people with Down syndrome exist—society and government will likely become less responsive to the needs of people with Down syndrome and their families.

On top of all this, the medical profession's involvement in "the use of abortion to cleanse their populations of babies whom some would view—ignorantly—of sapping the strength of society," Op.10 (Batchelder, J., dissenting), does immense

damage to the profession itself. An industry associated with the view that some lives are worth more than others is not likely to garner and retain the public's respect. And people with disabilities (Down syndrome, in particular) may be less likely to seek treatment if they fear drawing a doctor who disapproves of their having been born.

To address these concerns, Ohio enacted its Antidiscrimination Law.

## B. The Sixth Circuit affirmed the District Court's order preliminarily enjoining Ohio's Antidiscrimination Law.

Plaintiffs, all of whom are "abortion providers," sued the "state officials responsible for implementing and enforcing" the Antidiscrimination Law. Op.2. They argued that the law "unconstitutionally inhibits pre-viability abortions based on a woman's reason for seeking the abortion," and sought to enjoin it. *Id*. The District Court preliminarily enjoined the law after determining that women have a categorical right to a pre-viability abortion. A divided panel of this Court affirmed.

The majority, like the District Court, held that Supreme Court precedent creates a "categorical" right to a pre-viability abortion. Op.6 & n.1. The panel determined that Ohio violated this categorical prohibition by "prohibiting certain women from obtaining a pre-viability abortion." *Id*. at 8. Which women? The panel never says, but presumably women who would like to obtain an abortion based on Down syndrome diagnoses. Ohio had argued that the law *does not* prohibit

these women from obtaining abortions; they may abort the very same pregnancy for any reason other than a Down syndrome diagnosis. The majority never addressed this argument.

Judge Batchelder dissented. She explained that, under Supreme Court precedent, "pre-viability abortions are subject to restriction." Op.12. The "framework for evaluating such laws is the undue-burden test, which holds that" the State, "'[w]here it has a rational basis to act, and … does not impose an undue burden,'" may regulate pre-viability abortions "'in furtherance of its legitimate interests.'" *Id.* (quoting *Gonzales v. Carhart*, 550 U.S. 124, 158 (2007)).

Judge Batchelder concluded that the District Court erred by failing to apply the undue-burden test. If the panel majority had applied that test, Judge Batchelder explained, it would have ruled for the State. Ohio's interests in promoting "the integrity of the medical profession," and "upholding the equal dignity of the Down Syndrome population," provided a rational basis to act. *Id.* at 13. That left only the question whether the Antidiscrimination Law furthered these purposes or imposed an undue burden—questions the majority never considered, since it wrongly concluded that the right to a pre-viability abortion is "categorical." The straightforward connection between the Antidiscrimination Law and the State's purposes showed that the law furthered the State's interests. As for the undue-burden ques-

tion, the plaintiffs introduced no evidence that the law imposed any significant burden on the exercise of the right to an abortion. Nor did the Antidiscrimination Law, on its face, impose any such burden. After all, the law does not "require that a physician inquire into the motivations of the woman seeking an abortion, nor does it require the woman to disclose her motivations, nor does it instruct a physician to speculate." Op.13. "Only when a physician *knows* that an unborn child with a positive Down Syndrome diagnosis is being targeted for abortion *on that basis* does liability attach if the physician then performs the abortion anyway." *Id.* Because the District Court did not consider any of this, it erred. Judge Batchelder would have reversed, vacating the injunction.

## ARGUMENT

### I. The panel majority contradicted Supreme Court precedent when it invalidated Ohio's Antidiscrimination Law.

**A.** The Supreme Court has recognized a right to a pre-viability abortion. *Gonzales v. Carhart*, 550 U.S. 124, 146 (2007) (quoting *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 879 (1992) (plurality)). But it has left the States with substantial room to regulate such abortions. For example, States may ban partial-birth abortions; procedures in which the doctor partially delivers the child, splits open her skull with scissors, and vacuums out her brain. *Id.* at 138–39, 168. And States may ban minors from obtaining abortions without parental con-

sent or a court order. *Casey*, 505 U.S. at 899 (plurality); *id.* at 970 (Rehnquist, C.J., concurring in judgment, in part).

Significant government interests support each of these upheld regulations. Partial-birth abortions bear "disturbing similarity to the killing of a newborn infant," so banning the procedure furthers the "interest in protecting the integrity and ethics of the medical profession." *Gonzales*, 550 U.S. at 157, 158 (internal quotation marks omitted). The interest in the health and welfare of minors justifies parental-consent laws. *See Casey*, 505 U.S. at 899; *id.* at 970 (Rehnquist, C.J., concurring in judgment, in part).

State interests are constitutionally relevant in two ways. *First*, abortion laws, like all other laws, must rationally further legitimate government interests. In other words, the State must have "a rational basis to act." *Gonzales*, 550 U.S. at 158. *Second*, whether a law was passed in "furtherance of legitimate government interests bears upon" the question whether the law imposes an undue burden. *Id.* at 161. Why? Because a regulation imposes an "undue burden" if its "purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." *Id.* at 146 (citation omitted). A law that furthers legitimate government interests *does not* have the purpose of placing a substantial obstacle be-

tween a woman and her right to an abortion. Further, an obstacle may not seem so "substantial" if it exists to further a significant government interest.

Properly understood, Ohio's law is constitutional. As explained above, and in Judge Batchelder's dissent, the Antidiscrimination Law serves critically important government functions. The law keeps physicians from becoming "witting accomplices to the deliberate targeting of Down Syndrome babies." Op.11 (Batchelder, J., dissenting). That promotes "the principle that the Down Syndrome population is equal in value and dignity to the rest of Ohio's population." *Id*. It also protects "the integrity of the medical profession." *Id*. These are legitimate state interests, and no one can reasonably contest that a ban on eugenic abortions furthers these interests. So that leaves only the question whether the law imposes an undue burden. Does it?

No, it does not. At least, the plaintiffs have not carried their burden of *showing* that the law imposes such a burden. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (plaintiffs bear the burden of proof in undue-burden cases). The law does not prohibit any abortions at all. Any woman can obtain a pre-viability abortion of any pregnancy for *any reason except* a Down syndrome diagnosis. Even if she wants an abortion for that reason, she can get one: the Antidiscrimination Law "does not require that a physician inquire into the motivations of the woman seek-

ing an abortion, nor does it require the woman to disclose her motivations, nor does it instruct a physician to speculate." Op.13 (Batchelder, J., dissenting). The law regulates physicians' "witting" involvement in eugenic abortions, and nothing more. *Id.* at 11. That does not impose a "substantial" burden, or much of a burden at all. *Id.* at 13. And the plaintiffs introduced zero contrary evidence. Ohio's law must therefore be upheld.

**B.** The panel held that the right to a pre-viability abortion "is categorical." Op.6 & n.1. But the majority offered almost no support for this position.

For example, it relied heavily on this "quote" from *Casey*, which actually consists of two sentences separated by over thirty pages in the U.S. Reports:

> Before viability, the State's interests are not strong enough to support a prohibition of abortion … Regardless of whether exceptions are made for particular circumstances, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability.

Op.6 (quoting *Casey*, 505 U.S. at 846; *id.* at 879 (plurality)). This language has no bearing on the question at issue. The Antidiscrimination Law is not a "prohibition of abortion." *Id.* It does not even prohibit any particular *subset* of abortions; again, it leaves every woman entirely free to get *any* abortion of *any* pregnancy for *any* reason except a Down syndrome diagnosis. Indeed, a law barring doctors from performing abortions for a particular *reason* is no more a "prohibition of abortion"

14

than the law, upheld in *Gonzales*, prohibiting abortions performed in a particular *manner*.

The remainder of the majority's analysis simply cites Judge Manion's concurring opinion in *Planned Parenthood of Indiana and Kentucky, Inc. v. Comm'r of the Ind. State Dep't of Health*, 888 F.3d 300 (7th Cir. 2018), *vacated*, 727 Fed. Appx. 208, *reinstated and en banc denied*, 917 F.3d 532, *rev'd in part sub nom. Box v. Planned Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780 (2019). Judge Manion argued that, under current Supreme Court precedent, "*nothing* can stand between a woman and her choice of abortion before viability." *Id.* at 311. The panel does not try to defend that assertion, which contradicts the principles laid out above. Nor does the panel acknowledge the leading opinions on the other side of the debate, which arose in the same case: Judge Easterbrook's opinion regarding *en banc* review—joined by Judges Sykes, Barrett, and Brennan—and Justice Thomas's concurrence in the Supreme Court's summary reversal. *Planned Parenthood*, 917 F.3d 532, 536; *Box*, 139 S. Ct. at 1783. Both opinions agree that, and explain why, "[n]one of the Court's abortion decisions holds that states are powerless to prevent abortions designed to choose the sex, race, and other attributes of children." *Planned Parenthood*, 917 F.3d at 536 (Easterbrook, J., dissenting from denial of rehearing *en banc*); *accord Box*, 139 S. Ct. at 1783 (Thomas, J., concurring).

The majority's failure to grapple with these opinions is especially glaring because they are right. "Whatever else might be said about *Casey*, it did not decide whether the Constitution requires States to allow eugenic abortions." *Box*, 139 S. Ct. at 1783 (Thomas, J., concurring). The majority's contrary conclusion rests on the proposition that the right to a pre-viability abortion is categorical—a proposition that Supreme Court precedent squarely rejects. That contradiction with Supreme Court precedent justifies *en banc* review.

## II.     The question whether Ohio can regulate eugenic abortions is of exceptional importance.

The Court should rehear this case *en banc* for a second reason: it raises the extraordinarily important issue of whether and how States can pursue their "compelling interest in preventing abortion from becoming a tool of modern-day eugenics." *Id*.

"The use of abortion to achieve eugenic goals is not merely hypothetical." *Id*. To the contrary, "many countries" today "celebrate the use of abortion to cleanse their populations of babies whom some would view—ignorantly—as sapping the strength of society." Op.10 (Batchelder, J., dissenting). "France and Iceland, to name only two, have in recent years achieved a birth rate of nearly zero Down Syndrome infants." *Id*. In America, many parents of children with Down syndrome report having been subtly or overtly pressured to abort. *See above* 6–7.

Perhaps that is why, in America, *two-thirds* of unborn children with Down syndrome are aborted.  *Box*, 139 S. Ct. at 1790–91 (Thomas, J., concurring).

"Technological advances have only heightened the eugenic potential for abortion, as abortion can now be used to eliminate children with unwanted characteristics, such as a particular sex or disability." *Id.* at 1784.  That is of course bad for the targeted groups.  It is also dangerous for the medical profession, as highlighted above.  And it threatens to unwind much of this country's progress toward its founding ideal that everyone is created equal.  If some traits are bad enough to justify culling unborn children who exhibit them, anyone born with those traits is also marked as inferior.  "There is no caste" in America.  *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting).  If eugenic abortions become more common, there will be.

Undoubtedly, some will dismiss these fears as irrational.  That is their right. But the "nature of injustice is that we may not always see it in our own times." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2598 (2015).  Ohioans, through their representatives, acted early to prevent an injustice they saw on the horizon—the eradication of people with Down syndrome.  Does the Constitution prohibit Ohio from preventing that injustice?  Does the Constitution "supply a right" to choose "a child's genetic makeup after conception, aborting any fetus whose genes show a

likelihood that the child will be short, or nearsighted, or intellectually average, or lack perfect pitch—or be the 'wrong' sex or race?" *Planned Parenthood*, 917 F.3d at 536 (Easterbrook, J., dissenting from denial of rehearing *en banc*). These exceptionally important questions deserve *en banc* review.

## CONCLUSION

The Court should rehear this case *en banc*.

Respectfully submitted,

DAVE YOST
Ohio Attorney General

*/s/ Benjamin M. Flowers*
BENJAMIN M. FLOWERS*
Ohio Solicitor General
 *\*Counsel of Record*
STEPHEN P. CARNEY
Deputy Solicitor General
TIFFANY L. CARWILE
Assistant Attorney General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614-466-8980
bflowers@ohioattorneygeneral.gov

*Counsel for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this petition for rehearing and rehearing *en banc* complies with the type-volume requirements for such a petition, as it contains 3,882 words. *See* Fed. R. App. P. 35(b)(2)(A) & 40(b).

I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Equity font.

*/s/ Benjamin M. Flowers*
BENJAMIN M. FLOWERS

**CERTIFICATE OF SERVICE**

I hereby certify that on this 25th day of October 2019, this petition for re-hearing and rehearing *en banc* was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Benjamin M. Flowers*
BENJAMIN M. FLOWERS

# APPENDIX

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

PRETERM-CLEVELAND; PLANNED PARENTHOOD
SOUTHWEST OHIO REGION; WOMEN'S MED GROUP
PROFESSIONAL CORPORATION; ROSLYN KADE, M.D.;
PLANNED PARENTHOOD OF GREATER OHIO,

*Plaintiffs-Appellees*,

*v.*

LANCE HIMES, Director, Ohio Department of Health;
KIM G. ROTHERMEL, Secretary, State Medical Board
of Ohio; BRUCE R. SAFERIN, Supervising Member,
State Medical Board of Ohio,

*Defendants-Appellants.*

No. 18-3329

─────────────────

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:18-cv-00109—Timothy S. Black, District Judge.

Argued: January 30, 2019

Decided and Filed: October 11, 2019

Before: COLE, Chief Judge; BATCHELDER and DONALD, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Benjamin M. Flowers, OFFICE OF THE OHIO ATTORNEY GENERAL,
Columbus, Ohio, for Appellants. B. Jessie Hill, ACLU OF OHIO FOUNDATION, INC.,
Cleveland, Ohio, for Appellees. **ON BRIEF:** Steven T. Voigt, Tiffany L. Carwile, OFFICE OF
THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellants. B. Jessie Hill, Freda J.
Levenson, ACLU OF OHIO FOUNDATION, INC., Cleveland, Ohio, Alexa Kolbi-Molinas,
AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, Carrie Y.
Flaxman, PLANNED PARENTHOOD FEDERATION OF AMERICA, Washington, D.C.,
Jennifer L. Branch, GERHARDSTEIN & BRANCH CO. LPA, Cincinnati, Ohio, Melissa Cohen,
PLANNED PARENTHOOD FEDERATION OF AMERICA, New York, New York, for

Appellees.  Michelle K. Terry, AMERICAN CENTER FOR LAW & JUSTICE, Franklin, Tennessee, Misha Tseytlin, STATE OF WISCONSIN DEPARTMENT OF JUSTICE, Madison, Wisconsin, Brandon D. Harper, O'MELVENY & MEYERS LLP, Washington, D.C., Justine Lara Konicki, KOHRMAN JACKSON & KRANTZ, Cleveland, Ohio, Elise Porter, Columbus, Ohio, for Amici Curiae.

DONALD, J., delivered the opinion of the court in which COLE, C.J., joined. BATCHELDER, J. (pp. 10–14), delivered a separate dissenting opinion.

_____

**OPINION**

_____

BERNICE BOUIE DONALD, Circuit Judge.  Before us is an appeal from the district court's grant of a preliminary injunction against Defendants, enjoining them from implementing or enforcing Ohio law H.B. 214.  As enacted, H.B. 214 prohibits an abortion provider from performing an abortion with the knowledge that the decision to abort arises from a diagnosis or indication that the unborn child has Down Syndrome.  Plaintiffs, various abortion providers, sued Defendants, the state officials responsible for implementing and enforcing Ohio law H.B. 214, alleging H.B. 214 unconstitutionally inhibits pre-viability abortions based on a woman's reason for seeking the abortion.  The district court granted the preliminary injunction after concluding that Plaintiffs had shown a likelihood of success on the merits.  For the following reasons, we **AFFIRM** the district court.

**I.**

H.B. 214 was signed into law on December 22, 2017.  H.B. 214 amends Section 3701.79 of the Ohio Revised Code and enacts Sections 2919.10 and 2919.101.  Section 2919.10 prohibits any person from purposefully performing or inducing or attempting to perform or induce an abortion if the person has knowledge that the pregnant woman is seeking the abortion, in whole or in part, because of any of the following: (1) a test result indicating Down Syndrome in an unborn child; (2) a prenatal diagnosis of Down Syndrome in an unborn child; or (3) "any other reason to believe" that an unborn child has Down Syndrome.  Ohio Rev. Code § 2919.10(B). Violation of Section 2919.10 constitutes a fourth-degree felony, punishable by up to 18 months in prison.  Ohio Rev. Code §§ 2919.10(C) and 2929.14(A)(4).  Section 2919.10 further requires

the state medical board to revoke the license of a physician who violates it and makes that physician liable in a civil action for compensatory and exemplary damages. Ohio Rev. Code §§ 2919.10(D), (E).

Section 2919.101 requires that the performing physician attest in writing that he or she is not aware that fetal Down Syndrome is a reason for the woman's decision to terminate. Ohio Rev. Code § 2919.101(A). Additionally, Section 2919.101 requires the Ohio Department of Health to adopt rules to "assist in compliance with" Section 2919.101 within 90 days of its effective date. Ohio Rev. Code § 2919.101(B).

On February 15, 2018, Plaintiffs filed their complaint in the district court, alleging that H.B. 214 violates Plaintiffs' patients' rights to liberty and privacy, guaranteed by the Fourteenth Amendment, because the law prohibits pre-viability abortions based on the woman's reason for seeking the care. The complaint sought, *inter alia*, declaratory judgment that the laws amended and enacted by H.B. 214 are facially unconstitutional. At the time of filing, Plaintiffs also filed a motion for preliminary injunction declaring H.B. 214 unconstitutional and enjoining all Defendants from enforcing or complying with H.B. 214. The district court granted Plaintiffs' motion, finding that under *Roe* and *Casey*, a woman is expressly and unambiguously entitled to a pre-viability right to choose whether to terminate or continue her pregnancy.

## II.

To determine whether to grant a preliminary injunction, trial courts consider and balance four factors: (1) the likelihood that the moving party will prevail on the merits; (2) whether the moving party will be irreparably harmed absent the injunction; (3) the prospect that others will be substantially harmed if the court grants the injunction; and (4) the public interest in granting the injunction. *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc). These factors are not prerequisites requiring satisfaction, but rather "interrelated considerations" that the court must balance. *Concerned Pastors for Soc. Action v. Khouri*, 844 F.3d 546, 548–49 (6th Cir. 2016). "When a party seeks a preliminary injunction on the basis of a potential constitutional violation, 'the likelihood of success on the merits often will

be the determinative factor.'" *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (quoting *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009)).

On appeal from a grant or denial of a preliminary injunction, we review "the District Court's legal rulings *de novo* . . . and its ultimate conclusion [whether to issue a preliminary injunction] for abuse of discretion." *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 769 F.3d 447, 454 (6th Cir. 2014) (internal quotation marks omitted). While a "factual or legal error may alone be sufficient to establish that the court 'abused its discretion' in making its final determination . . . in the absence of such an error the district judge's weighing and balancing of the equities should be disturbed on appeal only in the rarest of cases." *NAACP v. City of Mansfield*, 866 F.2d 162, 166 (6th Cir. 1989) (quoting *Baja Contractors, Inc. v. City of Chicago*, 830 F.2d 667, 674 (7th Cir. 1987)).

Defendants argue that the panel should reverse the district court's decision because the district court applied an erroneous legal standard by creating an "absolute" or "categorical" right to a pre-viability abortion. In support of their argument, Defendants point to language in *Roe v. Wade* where the Supreme Court expressly rejected the claim that the right to abortion is "absolute" and therefore entitles a woman to obtain an abortion "for whatever reasons she alone chooses." 410 U.S. 113, 153 (1973). Under this reading of *Roe*, Defendants argue that the district court erred in treating the right to a pre-viability abortion as a "categorical" right that precludes any limitations based upon the reasons for the abortion. Instead, Defendants ask this Court to find that their alleged state interest in preventing discrimination based on a disability does not fall under *Roe* and *Casey* because in neither case did the Supreme Court consider such an interest. Defendants assert that instead, a strict scrutiny analysis should have been applied to determine whether the state's interest in preventing discrimination against persons with Down Syndrome outweighs a woman's right to privacy. Defendants argue that under a strict scrutiny analysis, Plaintiffs have not shown a likelihood of success on the merits because Ohio has compelling interests in protecting those with Down Syndrome, the integrity of the medical profession, and the Down Syndrome community and its civic voice.

**A.**

We first address Defendants' argument that *Roe* and *Casey* do not control here. Though the Constitution does not explicitly provide for any right of privacy, the Supreme Court has recognized that "a right of personal privacy, or a guarantee of certain areas or zones of privacy" is rooted in varying contexts under several Amendments to the Constitution. *Roe*, 410 U.S. at 152. This includes a woman's decision whether to terminate her pregnancy. *Id.* at 153. While the *Roe* Court found that a woman's decision to obtain an abortion is a fundamental right, the Court also acknowledged that "this right is not unqualified and must be considered against important state interests in regulation." *Id.* at 154. In *Roe*, the Court explained that, "a State may properly assert important interests in safeguarding health, in maintaining medical standards, and in protecting potential life" that "[a]t some point in pregnancy . . . become sufficiently compelling to sustain regulation of the factors that govern the abortion decision." *Id.* The Court then considered the interests set forth by the State and determined when these interests become sufficiently compelling:

> With respect to the State's important and legitimate interest in the health of the mother, the 'compelling' point, in the light of present medical knowledge, is at approximately the end of the first trimester . . . It follows that, from and after this point, a State may regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health.
>
> . . .
>
> With respect to the State's important and legitimate interest in potential life, the 'compelling' point is at viability. This is so because the fetus then presumably has the capability of meaningful life outside the mother's womb. State regulation protective of fetal life after viability thus has both logical and biological justifications. If the State is interested in protecting fetal life after viability, it may go so far as to proscribe abortion during that period, except when it is necessary to preserve the life or health of the mother.

*Id.* at 163–64.

Nearly twenty years later, the Court in *Planned Parenthood of Southeastern Pennsylvania v. Casey* upheld the *Roe* Court's holding, confirming that: "[t]he woman's right to terminate her pregnancy before viability is the most central principle of *Roe v. Wade*. It is a rule of law and a component of liberty we cannot renounce." 505 U.S. 833, 871 (1992). Moreover,

the Court in *Casey* drew the line between a woman's privacy right and the state's interest in the potential life of a fetus at viability, explaining that "[b]efore viability, the State's interests are not strong enough to support a prohibition of abortion . . . Regardless of whether exceptions are made for particular circumstances, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability." *Id.* at 846, 879.

Under *Roe* and *Casey*, it is clear that a law which furthers a state's interest in protecting the women's health or potential life, "may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability." *Casey*, 505 U.S. at 878–79 (explaining that a state may enact rules and regulations governing abortions so long as the regulation does not impose an "undue burden" on a woman's right to a pre-viability abortion). This right is categorical.[1] *See Planned Parenthood of Ind. and Ken., Inc. v. Comm'r of the Ind. State Dep't of Health*, 888 F.3d 300, 311 (7th Cir. 2018) (Manion, J., concurring) ("But the fact remains that *Casey* has plainly established an absolute right to have an abortion before viability. The joint opinion says that *nothing* can stand between a woman and her choice of abortion before viability." (emphasis in original)).

Defendants attempt to place H.B. 214 outside the scope of *Roe* and *Casey* by asserting an interest in preventing discrimination and arguing that *Roe* and *Casey* apply only to the state's interest in the woman's health and potential life. This argument lacks rigor and is deceptive in its construction. The Supreme Court has made clear that, before viability, the state's purported reason for prohibiting a woman from obtaining an abortion is not dispositive. *See Casey*, 505 U.S. at 877 ("[A] statute which, while furthering the interest in potential life *or some other valid*

---

[1]Defendants argue that treating the right to abortion as categorical and absolute improperly provides greater protection to abortion rights than other constitutional rights. In doing so, Defendants compare the right to abortion to the right to freedom of speech. However, such a comparison is inaccurate. Freedom of speech is more accurately compared to the right to privacy, the umbrella under which the right to abortion is found. Accordingly, the right to an abortion is more accurately compared to a specific right under freedom of speech, such as the freedom from being compelled by the state to deliver a government-mandated ideological message. *See Janus v. Am. Fed'n of State, Cty., & Mun. Emps, Council 31*, 138 S. Ct. 2448, 2463–64 (2018); *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). As the Court has made clear regarding this right, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein. If there are any circumstances which permit an exception, they do not now occur to us." *Barnette*, 319 U.S. at 642. Just as the right to be free from government coercion of ideological speech by private individuals is categorical, so too is the right to a pre-viability abortion.

*state interest*, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends.") (emphasis added); *id.* at 879 ("[A] State may not prohibit *any woman* from making the ultimate decision to terminate her pregnancy before viability.") (emphasis added).

The *Casey* Court recognized that the right to obtain an abortion is "unique to the human condition and so unique to the law." 505 U.S. at 852. As the Court explained:

> The mother who carries a child to full term is subject to anxieties, to physical constraints, to pain that only she must bear. That these sacrifices have from the beginning of the human race been endured by woman with a pride that ennobles her in the eyes of others and gives to the infant a bond of love cannot alone be grounds for the State to insist she make the sacrifice. Her suffering is too intimate and personal for the State to insist, without more, upon its own vision of the woman's role, however dominant that vision has been in the course of our history and our culture. The destiny of the woman must be shaped to a large extent on her own conception of her spiritual imperatives and her place in society.

*Id.*

Within the abortion context, the state's purported interest in preventing discrimination in this case is inescapably intertwined with the state's interest in potential life in *Roe* and *Casey*. Without the potential life, there would be no interest in preventing discrimination. To give credence to the argument that an interest such as preventing discrimination or stigma may lay outside the interest in potential life and be considered separately to determine a women's rights to abortion would be to ignore the unique condition of abortion recognized in *Casey*. *See Planned Parenthood of Ind. and Ken., Inc.*, 888 F.3d at 307 ("It is entirely inconsistent to hold that a woman's right of privacy to terminate a pregnancy exists if a woman decides before she becomes pregnant that she does not want to bear a child, but that the State can eliminate this privacy right if a woman later decides she wants to terminate her pregnancy for a particular purpose."). Accordingly, we conclude that H.B. 214 is subject to the precedent set forth in *Roe* and *Casey* and, therefore, the state's interest in preventing discrimination does not become compelling until viability.[2]

---

[2]Defendants additionally argue that they have an interest in protecting the integrity of the medical profession. However, this asserted interest falls clearly under *Roe* and *Casey*. *Roe*, 410 U.S. at 154 (recognizing

**B.**

We next address the four factors used to determine whether the district court appropriately granted the preliminary injunction. First, having concluded that *Roe* and *Casey* control, Plaintiffs have clearly shown a strong likelihood of success on the merits. Even though, as Defendants note, H.B. 214 limits only a small subset of pre-viability abortions, because H.B. 214 has both the purpose and effect of prohibiting certain women from obtaining a pre-viability abortion, it is invalid under *Casey*. *Casey*, 505 U.S. at 846, 879 ("Before viability, the State's interests are not strong enough to support a prohibition of abortion. . . Regardless of whether exceptions are made for particular circumstances, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability."); *see also Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2320 (2016) (explaining that a law does not have to impose a substantial obstacle on a "large fraction" of women generally because "the relevant denominator is 'those [women] for whom [the provision] is an actual rather than an irrelevant restriction.'" (alterations in original) (quoting *Casey*, 505 U.S. at 895)).

A weighing of the other three factors tips the scales in favor of Plaintiffs as well. As to the likelihood that the moving party would be irreparably harmed, Plaintiffs' patients would be irreparably harmed as a matter of law by the loss of their constitutional right to seek an abortion before viability. *See Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) ("[W]hen reviewing a motion for a preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987) (finding irreparable injury where plaintiff showed substantial likelihood of success on merits of constitutional challenge to abortion regulation). Plaintiffs have likewise shown that the equities and public interest weigh in their favor. A preliminary injunction in this case would merely preserve the status quo and ensure Plaintiffs'

---

that a state "may properly assert important interests in . . . maintaining medical standards"). Further, this argument fails because "[w]hile the Supreme Court has acknowledged that a state has a legitimate interest in protecting the integrity and ethics of the medical profession, the Supreme Court has recognized that a state cannot use its regulatory power to impose an undue burden on a woman's right to choose." *Preterm-Cleveland v. Himes*, 294 F. Supp. 3d 746, 756 (S.D. Ohio 2018) (citing *Gonzales v. Carhart*, 550 U.S. 124, 157–58 (2007)).

patients have access to constitutionally protected health care services through the duration of the case. And "the public is certainly interested in the prevention of enforcement of [laws] which may be unconstitutional." *Planned Parenthood Ass'n of Cincinnati, Inc.*, 822 F.2d at 1400. Finally, as to the harm to others, Defendants argue that a preliminary injunction will harm the state because any time a state is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury. Because we have already concluded that there is a likelihood that the statute is unconstitutional, it is "questionable whether the [State] has any 'valid' interest in enforcing" it. *Id.* Even if the Defendants' argument was true, however, because all three other factors weigh in favor of Plaintiffs, the district court did not abuse its discretion in granting a preliminary injunction.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of the preliminary injunction.

---

**DISSENT**

---

ALICE M. BATCHELDER, Circuit Judge, dissenting.  In *Box v. Planned Parenthood of Indiana and Kentucky, Inc.*, 139 S. Ct. 1780, 1782-93 (2019), Justice Thomas explained how Indiana's law "and other laws like it promote a State's compelling interest in preventing abortion from becoming a tool of modern-day eugenics," *id.* at 1783 (Thomas, J., concurring).  The same goes for Ohio's law H.B. 214 before us today.  Even more to the point here, perhaps, given the majority's analysis, is the further explanation that, "[w]hatever else might be said about *Casey*, it did not decide whether the Constitution requires States to allow eugenic abortions."  *Id.* at 1792 (Thomas, J., concurring).  I would apply that reasoning here to uphold Ohio H.B. 214.

In this challenge to H.B. 214, we hear the distant echo of the sorry case of *Buck v. Bell*, 274 U.S. 200, 207 (1927), in which the Supreme Court upheld a Virginia law—under which state officials sought to sterilize Carrie Buck, "the probable potential parent of socially inadequate offspring"—by finding that to allow such births would "sap the strength of the State" and "swamp" society "with incompetence."  The effect was the federal judicial endorsement of eugenics.  In fact, "[a]s an advertisement for eugenics, *Buck v. Bell* worked."  Jeffrey S. Sutton, *51 Imperfect Solutions* 117 (2018).  Within five years, a majority of states had enacted eugenics laws, *id.*, and annual forced sterilizations increased tenfold to almost 2,300.  Peter Quinn, *Race Cleansing In America*, 54 American Heritage, 2-3 (2003).

The eugenicist impulse on display in *Buck*, and amplified in its aftermath, is no mere relic of history.  Today, many countries celebrate the use of abortion to cleanse their populations of babies whom some would view—ignorantly—as sapping the strength of society.  France and Iceland, to name only two, have in recent years achieved a birth rate of nearly zero Down Syndrome infants.[1]

---

[1]The record contains a declaration by a physician and medical ethicist that France aborts 96% of unborn children who receive a diagnosis of Down Syndrome.  Iceland, as public policy, appears to be nearing a 100% rate of abortion for unborn children diagnosed with Down Syndrome.

Ohio enacted the Antidiscrimination Law, H.B. 214, to counteract such eugenicist practices concerning the prenatal Down Syndrome population. The law prevents a physician from performing an abortion when the physician knows the abortion is sought not because the woman did not intend to become pregnant, but because the child in the woman's womb tested positive for Down Syndrome. Ohio concluded that permitting physicians to become witting accomplices to the deliberate targeting of Down Syndrome babies would undermine the principle that the Down Syndrome population is equal in value and dignity to the rest of Ohio's population, and would do deep damage to the integrity of the medical profession.

The majority holds Ohio's choice unconstitutional. But controlling precedent requires that we review laws like H.B. 214 under an undue-burden analysis, which is fact-intensive and must consider the State's interests and the benefits of the law, not just the potential burden it places on women seeking an abortion. Neither the district court nor the majority here makes a genuine attempt to meet that demand, which leaves their decisions insupportable and incorrect.

Consider *Gonzales v. Carhart*, 550 U.S. 124 (2007), in which the Supreme Court upheld a federal law banning—both before and after viability—a method of partial-birth abortion. The Court emphasized the post-viability status in describing the procedure in the second trimester:

> Dr. Haskell went in with forceps and grabbed the baby's legs and pulled them down into the birth canal. Then he delivered the baby's body and the arms—everything but the head. The doctor kept the head right inside the uterus . . . The baby's little fingers were clasping and unclasping, and his little feet were kicking. Then the doctor stuck the scissors in the back of the head, and the baby's arms jerked out, like a startle reaction, like a flinch, like a baby does when he thinks he is going to fall. The doctor opened up the scissors, stuck a high-powered suction tube into the opening, and sucked the baby's brains out. Now the baby went completely limp . . . He cut the umbilical cord and delivered the placenta. He threw the baby in a pan, along with the placenta and the instruments he had just used.

*Id.* at 138-39. The Court's decision to uphold the restriction rested on the doctrinal principles set forth in *Roe v. Wade*, 410 U.S. 113 (1973), as refined and amended by *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833 (1992). What makes *Gonzales* particularly applicable here is that there, as here, the Court dealt not with a *total ban* against abortion but with a regulation that prohibited physicians from performing abortions under certain conditions. The

*Gonzales* Court evaluated the partial-birth abortion law in light of two government interests: protecting fetal life from an inhumane procedure and protecting the integrity of the medical community. *Gonzales*, 550 U.S. at 156-58. Likewise, in addition to other asserted interests, Ohio justified H.B. 2014 on the express ground that it will protect the integrity of the medical profession.

Three principles drawn from *Gonzales* guide our analysis. One, pre-viability abortions are subject to restriction, as that is precisely what *Gonzales* upheld. *Id.* at 147 ("The Act does apply both previability and postviability."). Two, pre-viability abortion restrictions can be justified by a governmental interest in, among other things, "protecting the integrity and ethics of the medical profession." *Id.* at 157 (internal quotation marks omitted). And, three, the framework for evaluating such laws is the undue-burden test, which holds that, "[w]here it has a rational basis to act, and it does not impose an undue burden, the State may use its regulatory power to bar certain procedures and substitute others, all in furtherance of its legitimate interests." *Id.* at 158. Applying this legal framework, our task was therefore to decide whether the district court erred by finding that Preterm-Cleveland could likely prove that H.B. 214 lacks a rational basis, fails to further the asserted interest, or imposes an undue burden on women seeking abortions. *See id.* at 157-61.

But the district court made no effort to apply anything resembling this legal standard, giving the nod to the undue-burden framework in a mere four sentences of conclusory rhetoric:

> H.B. 214 is clearly an 'undue burden.' The 'obstacle' it places in the path of women seeking a pre-viability abortion for one of the proscribed reasons is not merely 'substantial,' it is insurmountable. H.B. 214 does not 'burden' the right of such women to choose a pre-viability abortion, it eradicates the right entirely. Because H.B. 214 prevents certain women from choosing to terminate a pregnancy pre-viability, and because 'the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure,' H.B. 214 is unconstitutional.

*Preterm-Cleveland v. Himes*, 294 F. Supp. 3d 746, 754-55 (S.D. Ohio 2018) (citing *Casey*, 505 U.S. at 846). That is not the legal framework established in *Gonzales*.

The district court cited no evidence to support its bald assertion that H.B. 214 places an "insurmountable" obstacle in the path of women seeking an abortion and that alone would

warrant reversal.  *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (reversing a preliminary injunction against a Montana law because "there was insufficient evidence in the record that the requirement posed a 'substantial obstacle' to abortion").  And that sparse analysis also fails the mandate of *Whole Women's Health v. Hellerstedt*, 136 S.Ct. 2292 (2016), in which the Court held that the undue-burden analysis requires an examination of "the burdens a law imposes on abortion access *together with the benefits* those laws confer," *id.* at 2309 (emphasis added). The district court's opinion contains no recognition of any benefits, though they are not hard to find:  Ohio's interest in the integrity of the medical profession qualifies as rational under *Gonzales*, and as an "Antidiscrimination Law," H.B. 214 serves Ohio's interest in upholding the equal dignity of the Down Syndrome population by ending discriminatory practices against that population.

The other two prongs of the *Gonzales* inquiry—whether the law furthers the government's interests and whether the law imposes an undue burden—are questions that the district court declined to address or to develop a record on which to base an answer.  A plain reading of H.B. 214 does not alone reveal the nature or degree of any burden the law may place on women seeking abortions.  For example, while H.B. 214 does require that "the attending physician shall indicate that [he or she] does not have knowledge" that the woman was seeking the abortion because of the unborn child's having Down Syndrome, H.B. 214 does not require that a physician inquire into the motivations of the woman seeking an abortion, nor does it require the woman to disclose her motivations, nor does it instruct a physician to speculate.  Only when a physician *knows* that an unborn child with a positive Down Syndrome diagnosis is being targeted for abortion *on that basis* does liability attach if the physician then performs the abortion anyway.  *See* O.R.C. § 2929.10(B).

It is possible that, even if a woman were to volunteer that she was seeking an abortion because her unborn child had tested positive for Down Syndrome, the physician could refer the woman to another physician.  Under a proper analysis, such a consequence may not qualify as an undue burden.  *See Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 605 (6th Cir. 2006) ("While closing the Dayton clinic may be burdensome for some of its potential patients, the fact that these women may have to travel farther to obtain an abortion does not constitute a

substantial obstacle."). And whether the abortion of unborn children diagnosed with Down Syndrome "requires specific regulation because it implicates additional ethical and moral concerns that justify a special prohibition," *Gonzales*, 550 U.S. at 158, is a question that must be explicitly addressed.

For these reasons and those presented by Justice Thomas in his concurrence in *Box*, I must respectfully dissent.