**No. 18-3329**
**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

PRETERM-CLEVELAND; PLANNED PARENTHOOD OF SOUTHWEST OHIO REGION;
WOMEN'S MEDICAL PROFESSIONAL CORPORATION; DOCTOR ROSLYN KADE;
PLANNED PARENTHOOD OF GREATER OHIO,
*Plaintiffs-Appellees,*

v.

AMY ACTON, DIRECTOR, OHIO DEPARTMENT OF HEALTH, KIM G. ROTHERMEL,
SECRETARY, STATE MEDICAL BOARD OF OHIO, BRUCE R. SAFERIN, SUPERVISING
MEMBER, STATE MEDICAL BOARD OF OHIO,
*Defendants-Appellants,*

JOSEPH T. DETERS, HAMILTON COUNTY PROSECUTOR; MICHAEL C. O'MALLEY,
CUYAHOGA COUNTY PROSECUTOR; MATT HECK, JR., MONTGOMERY COUNTY
PROSECUTOR; RON O'BRIEN, FRANKLIN COUNTY PROSECUTOR,
*Defendants.*

On Appeal from the United States District Court
for the Southern District of Ohio, No. 1:18-cv-00109

**AMICI CURIAE BRIEF OF BIOMEDICAL ETHICISTS**
**IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

Chris A. Hollinger
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111-3823
Telephone: (415) 984-8700

Hannah E. Dunham
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90072
Telephone: (213) 430-6000

Ethan M. Scapellati
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000

*Attorneys for Amici Curiae Biomedical Ethicists*

# TABLE OF CONTENTS

Page

STATEMENT OF INTEREST ..................................................................... 1

STATEMENT OF ISSUE .......................................................................... 2

INTRODUCTION ...................................................................................... 2

ARGUMENT .............................................................................................. 4

    I.     There Is No "Modern Eugenics Trend" In Favor Of Abortion Where The Fetus Has Been Diagnosed With Down Syndrome ...................... 4

    II.    The Ohio Ban Undermines The Patient-Physician Relationship ......... 8

CONCLUSION ......................................................................................... 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
  138 S. Ct. 2361 (2018) ..................................................................................8

*State v. Desper*,
  151 Ohio App. 3d 208, 783 N.E.2d 939 (2002)................................3, 12

*State v. Garrett*,
  8 Ohio App. 3d 244, 456 N.E.2d 1319 (1983)........................................3

*Wollschlaeger v. Governor, Fla.*,
  848 F.3d 1293 (11th Cir. 2017) .............................................................12

**Other Authorities**

American College of Medical Genetics and Genomics, "Access to
  reproductive options after prenatal diagnosis—patient access and
  physician responsibilities: an updated position statement of the
  American College of Medical Genetics and Genomics", *Genetics in
  Medicine*, 2020 ................................................................................5, 9

American College of Obstetricians and Gynecologists, Informed
  Consent, Committee Opinion No. 439, *Obstetrics & Gynecology*,
  2009........................................................................................................5

American College of Physicians Ethics Manual 78 ....................................9

American Medical Association Code of Medical Ethics, Opinion
  2.1.1, Informed Consent...........................................................................10

American Medical Association Code of Medical Ethics, Opinion
  2.1.2, Decisions for Adult Patients Who Lack Capacity .........................9

American Medical Association Code of Medical Ethics,
  Opinion 4.1.2, Genetic Testing for Reproductive Decision Making.......6

American Medical Association, House of Delegates Proceedings,
  Annual Convention 1967 40, 202 ............................................................6

Erik Parens & Adrienne Asch, "The Disability Rights Critique of
Prenatal Genetic Testing: Reflections and Recommendations,"
Hastings Center Report (Sept.-Oct. 1999) ......................................................6, 11

Jamie L. Natolie et al., *Prenatal Diagnosis of Down Syndrome: A
Systematic Review of the Termination Rates (1995-2011)* 32
Prenatal Diagnosis 142 (2012) ...............................................................................7

Renate Lindeman, *A Moral Duty to Abort*, R.25-1 ....................................................7

Mikyong Shin et al., *Prevalence of Down Syndrome Among Children
and Adolescents in 10 Regions of the United States*, 124 Pediatrics
1565 (2009) ...............................................................................................................7

National Council on Disability, "Genetic Testing and the Rush to
Perfection: Part of the Bioethics and Disability Series" (Oct. 23,
2019).........................................................................................................................9

National Down Syndrome Congress, "Position Statement on Prenatal
Testing and Eugenics: Families' Rights and Needs,"
http://members.carol.net/ndsc/eugenics.html......................................................11

National Society for Genetic Counselors, "National Society for
Genetic Counselors Code of Ethics," in Prescribing Our Future:
Ethical Challenges in Genetic Counseling (ed. Dianne M. Bartels,
Bonnie S. LeRoy, Arthur L. Caplan) (New York: Aldine De
Gruyter, 1993) .........................................................................................................6

## STATEMENT OF INTEREST[1]

*Amici curiae* (listed in the Appendix hereto) state that they are a group of physicians, other health care practitioners, and professors in various fields – including law, medicine, and public health – from universities across the United States, who teach and/or write about biomedical ethics.[2] Collectively, *amici* hold a multitude of degrees, including JDs, MDs, PhDs, and MPHs, and have decades of experience in this field. Several *amici* serve or have served on national biomedical ethics committees and/or lead university centers and institutes devoted to this subject. All *amici* have made contributions to the scholarship and thoughtful practice of medical ethics.

*Amici* offer this brief in support of Plaintiffs-Appellees to discuss the application of medical ethics to Ohio's H.B. 214 (the "Ohio Ban"), which criminalizes the performance of an abortion when the physician has knowledge that the patient is seeking an abortion, in whole or in part, because of an indication of fetal Down syndrome. A number of the *amici curiae* listed in the Appendix to

---

[1]    This brief, along with the accompanying motion for leave, is submitted pursuant to Federal Rule of Appellate Procedure 29(a)(4)(D). Undersigned counsel certify that: this brief was not authored in whole or in part by counsel for any of the parties; no party or party's counsel contributed money for this brief; and no one other than *amici* and their counsel have contributed money for this brief.

[2]    Institutional affiliations are provided for identification purposes only. The views expressed in this brief do not necessarily reflect the views of *amici*'s institutions.

- 1 -

this brief served as *amici curiae* earlier in this case, when a three-judge panel ruled in favor of Plaintiffs-Appellees.[3]

## STATEMENT OF ISSUE

Whether the criminalization of performing a pre-viability abortion when the physician has knowledge that the patient is seeking the abortion, in whole or in part, because of an indication of fetal Down syndrome is consistent with the prevailing views regarding medical ethics and the physician-patient relationship.

## INTRODUCTION

On the one hand, Defendants-Appellants contend that the Ohio Ban does not "substantially obstruct the abortion right" because it "'does not require that a physician inquire into the motivations of the woman seeking an abortion, nor does it require the woman to disclose her motivations.'"[4] On the other hand, they seek to justify the Ohio Ban on the ground that it "promotes the State's important interest in safeguarding medical ethics."[5] Under the Ohio Ban, the only way for a

---

[3]     For further explanation of *amici*'s interest in this matter, *see Amici Curiae* Brief of Biomedical Ethicists in Support of Plaintiffs-Appellees and Affirmance ("Prior Ethics Br.") (ECF No. 38) at 1-3. All citations herein to documents filed with the Court are to the internal page-numbering of the documents and not to the ECF-generated page-numbering.

[4]     Defendants-Appellants' Supplemental Brief On Rehearing En Banc ("Ohio Supp. Br.") (ECF No. 83) at 3 (quoting Panel Op. at 13 (Batchelder, J., dissenting)).

[5]     *Id.*

patient to have an otherwise-lawful medical procedure is through lying, a "wink and a nod," or a lack of communication between patient and physician about the patient's reasons for a particular health care choice. Such a law is not – by any stretch of the imagination – a law which promotes the integrity and ethics of the medical profession. To suggest otherwise is Orwellian in its purest form.

Indeed, the justifications for the Ohio Ban proffered by Defendants-Appellants and their *amici* are premised on a complete misunderstanding of the prevailing standard of care in the medical profession, which mandates non-directive counseling, and also run counter to Ohio's public policy, reflected in its legislatively-created physician-patient privilege, to "encourage patients to be forthcoming and candid in their statements to physicians by whom they are being treated in the belief that candor by the patient results in better treatment by the physician."[6] Whatever the merits of the Ohio Ban, the law would do a significant disservice to the ethical practice of medicine and the physician-patient relationship.

---

[6] *State v. Garrett*, 8 Ohio App. 3d 244, 246, 456 N.E.2d 1319, 1321 (1983); *see also State v. Desper*, 151 Ohio App. 3d 208, 221, 783 N.E.2d 939, 949 (2002) (explaining that "[a] lie to a physician regarding information used in treating the patient is not furthering the objective of the statute" which created the physician-patient privilege).

**ARGUMENT**

One of the purported reasons for enacting the Ohio Ban was to "protect the integrity and ethics of the medical profession."[7] The State thus frames the law as guarding against a "re-emergence of the early twentieth century's pro-eugenics mindset," relying upon the notion that "medical ethicists . . . openly advocate Down-syndrome-selective abortions."[8] But the State is wrong. As explained below, there simply is no "modern eugenics trend" within the medical community in favor of abortion when the fetus has a positive test for Down syndrome. To the contrary, the controlling standard of care mandates non-directive counseling within the framework of the principle of informed consent. Moreover, in addition to lacking evidence in support of its stated purpose, the Ohio Ban affirmatively infringes on the physician-patient relationship by stifling the open and honest communication necessary for patients to make well-informed decisions in light of their own particular circumstances.

**I.     There Is No "Modern Eugenics Trend" In Favor Of Abortion Where The Fetus Has Been Diagnosed With Down Syndrome.**

According to the State, because two-thirds of unborn children in this country diagnosed with Down syndrome are aborted, physicians must be pressuring

---

[7]     Ohio Supp. Br. at 12 (internal punctuation and citation omitted).

[8]     *Id.* at 14-15.

patients to terminate their pregnancies.[9]  Therefore, the argument goes, to safeguard "medical ethics and 'the integrity of the medical profession,'" the Ohio Ban "bar[s] physicians from becoming 'witting accomplices to the deliberate targeting of Down Syndrome babies.'"[10]  The State's assumptions about physician behavior have no basis in fact.

To the contrary, the reality in this country is that "[i]n the context of genetic counseling . . . *being non-directive is the norm*."[11]  The widely-accepted standard of care requires that physicians provide their patients with neutral information, while remaining empathetic to the patients' individual perspectives and values.[12] As articulated in the National Society of Genetic Counselors Code of Ethics, health care professionals must be "committed to helping individuals understand genetic information and to acting on that information in accordance with their [*i.e.*, the

---

[9]      *Id.* at 15.

[10]     *Id.* at 3 (quoting Panel Op. at 11 (Batchelder, J, dissenting)).

[11]     *See* American College of Obstetricians and Gynecologists ("ACOG"), Informed Consent, Committee Opinion No. 439, *Obstetrics & Gynecology*, 2009, 114(2):404 (emphasis added); *see also* American College of Medical Genetics and Genomics ("ACMG"), "Access to reproductive options after prenatal diagnosis—patient access and physician responsibilities: an updated position statement of the American College of Medical Genetics and Genomics", *Genetics in Medicine*, 2020, 22:3 ("ACMG Statement") ("The ACMG believes strongly that a balanced discussion of reproductive options is required . . . . Further, it is the legal and ethical responsibility of healthcare professionals to provide complete and accurate information including all management options to patients.").

[12]     *Id.*

patients'] own values. Respect for the equality of persons and for the legitimate

heterogeneity of their life projects is arguably one of the most substantive values

available to us."[13] The American Medical Association is in accord: "Physicians

who provide reproductive health care that includes testing should: (a) Adhere to

standards of nondirective counseling and avoid imposing their personal moral

values or judgment on the patient . . . (e) Respect an individual's decision to

terminate or continue a pregnancy when testing reveals a genetic abnormality in

the fetus, in accordance with applicable law."[14]

Against the authoritative pronouncements of the leading organizations in the

field, the State and its *amici* cite to a declaration by a doctor discussing physicians

---

[13]     Erik Parens & Adrienne Asch, "The Disability Rights Critique of Prenatal
Genetic Testing: Reflections and Recommendations," Hastings Center Report at
p. S-19 (Sept.-Oct. 1999) (citing National Society for Genetic Counselors,
"National Society for Genetic Counselors Code of Ethics," in Prescribing Our
Future: Ethical Challenges in Genetic Counseling (ed. Dianne M. Bartels, Bonnie
S. LeRoy, Arthur L. Caplan) (New York: Aldine De Gruyter, 1993), pp. 169-71).

[14]     American Medical Association ("AMA") Code of Medical Ethics,
Opinion 4.1.2, Genetic Testing for Reproductive Decision Making.  The amicus
brief filed by Indiana, Kentucky, And 16 Other States ("Br. of 18 States") cites the
proceedings from the AMA's annual convention in 1967 as support for their claim
that the medical profession endorses disability-selective abortion (*see* Br. of 18
States at 7), but conveniently fails to mention the qualification in the AMA's
policy statement to the effect that "[p]rior to the institution of a therapeutic
abortion the patient and her family should be fully advised of the medical
implications and the possible untoward emotional and physical sequelae of the
procedure."  AMA, House of Delegates Proceedings, Annual Convention 1967 40,
202.  In any event, as confirmed in the passage quoted in the text, the views of the
AMA from more than 50 years ago do not reflect its views today.

who appear to have departed from the above-described standard of care.[15] But these anecdotal experiences do not represent, and do not even purport to represent, a uniform or common practice on the part of American health care professionals. Moreover, the fact that the abortion rate with a Down syndrome diagnosis is high in other countries is of no consequence here; Iceland and France are not the United States, let alone Ohio.[16]

---

[15]  Ohio Supp. Br. at 6, 15 (citing Keough Decl., R.25-1, PageID #178).

[16]  Panel Op. at 10 n.1 (Batchelder, J., dissenting); *but see* Plaintiffs-Appellees' Supplemental Brief On Rehearing En Banc (ECF No. 94) at 3 ("[S]tudies— including one study submitted by the State—indicate that abortions in cases where there is a Down syndrome diagnosis are actually *decreasing* in the United States, and that birth rates of infants with Down syndrome are *increasing*.") (citing Jamie L. Natolie et al., *Prenatal Diagnosis of Down Syndrome: A Systematic Review of the Termination Rates (1995-2011)* 32 Prenatal Diagnosis 142, 150-51 (2012); Mikyong Shin et al., *Prevalence of Down Syndrome Among Children and Adolescents in 10 Regions of the United States*, 124 Pediatrics 1565, 1567 (2009)). Neither the State, nor Indiana, Kentucky, and 16 Other States, nor the United States, has any special competence to opine on medical ethics. This is clear, for example, from the State's reliance on the views of people who themselves have no special expertise in medical ethics, such as Richard Dawkins, who is not a medical ethicist, and Renate Lindeman, who has no expertise in ethics but is instead "a mother of two daughters with Down syndrome [and] a spokesperson for Downpride and the StopDiscriminatingDown Campaign and a team member of Saving Downsyndrome." Renate Lindeman, *A Moral Duty to Abort*, R.25-1, PageID #161, at #162. While the supporters of the State's position are no doubt sincere in their beliefs, it is respectfully submitted that it is the signatories hereto – comprising a large collection of the leading medical ethicists in the United States – who are competent to speak to the standard of care generally practiced by physicians throughout the country.

*Amici* are mindful that there will inevitably be some health care personnel who depart from the standard of non-directive counseling and, consciously or unconsciously, steer a patient in the direction of abortion following a prenatal diagnosis of Down syndrome – just as there will inevitably be some health care personnel who steer the patient in the opposite direction. But *amici* are also mindful that, when presented with complete and accurate information in a neutral manner, many patients (not all, of course) undeniably will "rationally" decide that abortion is the right choice for them in light of their personal circumstances and values. Put differently, the Ohio Ban is wrong in its treatment of every patient's decision to have an abortion as an instance of over-reaching by her physician. If there are breakdowns in adherence to the standard of non-directive counseling, the solution which promotes the "integrity and ethics of the medical profession" is to better ensure that patients receive full and complete information so that they can make the best decision for themselves.[17] While it possibly could promote other interests, the Ohio Ban's "solution" – under which physicians are prohibited from providing a health care option selected by their patients within the framework of

---

[17]  *See Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2376 (2018) (noting that State of California could undertake a public-information campaign to inform women of public programs providing free or low-cost access to family planning services, prenatal care, and abortion – rather than requiring private clinics to distribute government-prescribed information on the same subjects).

non-directive counseling and informed consent – manifestly does *not* promote the integrity and ethics of the medical profession and the Ohio Ban cannot be justified on that basis.

## II. The Ohio Ban Undermines The Physician-Patient Relationship.

Patient autonomy is a foundational principle of medical ethics, including in situations involving a patient's right to make her own decision about terminating a pregnancy.[18] Physicians must provide patients with accurate and complete diagnoses and descriptions of medical conditions in order to "inform the patient about care options and alternatives," or "refer the patient for such information, so that the patient's rights are not constrained" and the patient autonomously can make the best choice for herself in light of her own values and circumstances.[19] This process requires the physician and patient to have open and honest

---

[18] *See, e.g.*, AMA Code of Medical Ethics, Opinion 2.1.2, Decisions for Adult Patients Who Lack Capacity ("Respect for patient autonomy is central to professional ethics and physicians should involve patients in health care decisions commensurate with the patient's decision-making capacity.").

[19] American College of Physicians ("ACP") Ethics Manual 78; *see also* National Council on Disability, "Genetic Testing and the Rush to Perfection: Part of the Bioethics and Disability Series" 61-62 (Oct. 23, 2019) (criticizing laws that create "barriers on women's right to full reproductive information and their practical ability to act on their choices, including the choice to terminate a pregnancy for private reasons."); *see also* ACMG Statement, *supra* n. 11 ("ACMG strongly opposes any legislation that prohibits healthcare professionals from providing complete and accurate medical care, or in any manner penalizes the provision of such care.").

communication, and proper communication between physician and patient requires physicians to discuss a patient's reason(s) for continuing or terminating a pregnancy.[20]

The Ohio Ban would destroy this line of communication. With the ominous threat of criminal liability, physicians would hesitate to discuss prenatal diagnoses of Down syndrome with their patients – a harmful result from the standpoint of protecting the physician-patient relationship, but a result which the State nonetheless trumpets as a reason why the Ohio Ban is not so bad after all.[21] And patients would be hesitant to openly discuss the diagnosis and their options in response thereto – another harmful result from the standpoint of protecting the physician-patient relationship, and another result which the State trumpets as a reason why the Ohio Ban is not so bad.[22]

The Ohio Ban is also counter-productive to the State's professed goal of preventing discrimination. A patient might decide (with input from the internet but not her physician) to have an abortion after a fetal diagnosis of Down syndrome based on stereotypes and inaccurate information – even though an open and honest

---

[20]     AMA Code of Medical Ethics, Opinion 2.1.1, Informed Consent ("Informed consent to medical treatment is fundamental in both ethics and law. Patients have the right to receive information and ask questions about recommended treatments so they can make well-considered decisions about care.").

[21]     *See* Ohio Br. at 19.

[22]     *See id.* at 18.

discussion with her physician could have resulted in the opposite decision. It is for this reason that the National Down Syndrome Congress has published the essential information it believes physicians should convey to patients considering abortion of a fetus with a positive prenatal diagnosis of disability:

> (a) information that seeks to dispel common misconceptions about disability and present disability from the perspective of a person with a disability; (b) information on community-based services for children with disabilities and their families as well as on financial assistance programs; and (c) materials on special needs adoption; and (d) a summary of major laws protecting the civil rights of persons with disabilities. [Also,] people with disabilities and parents of people with disabilities should be [made] available to talk with future parents.[23]

A patient provided with this kind of information would be in a much better position to make an informed decision about terminating a fetus or carrying the child to term. Yet, by intentionally chilling discussions between a physician and patient about the patient's motivations for potentially terminating a pregnancy, the Ohio Ban encourages the patient to remain ignorant of what it is like to raise a child with Down syndrome in the 21st Century – including all the improvements cited by the State (Ohio Br. at 7) and to be commended by society as a whole – or to obtain all of the relevant information but then lie to her physician if she decides the best choice for her is the choice deemed politically incorrect in Ohio.

---

[23]     Parens & Asch, "The Disability Rights Critique of Prenatal Genetic Testing: Reflections and Recommendations" S-21 (citing National Down Syndrome Congress, "Position Statement on Prenatal Testing and Eugenics: Families' Rights and Needs," http://members.carol.net/ndsc/eugenics.html).

A law which effectively mandates a conspiracy of silence between physician

and patient, or which encourages the patient to be dishonest with her physician, or

which encourages the physician to keep her "head in the sand" about her patient's

health care choices, is a law which undermines – not promotes – the physician-

patient relationship and the ethics and integrity of the medical profession.[24]

## CONCLUSION

For the foregoing reasons, *amici* join Plaintiffs-Appellees in urging this

Court to affirm the district court's decision.

---

[24]    *See Desper*, 151 Ohio App. 3d at 220, 783 N.E.2d at 949 ("In fact, a lie
might actually hinder the physician's ability to treat the patient."); *cf.
Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1301 (11th Cir. 2017) (holding
unconstitutional, under the First Amendment, Florida law prohibiting physicians
from asking about whether there were firearms in a patient's home and from noting
the response in a patient's medical records). Indeed, patients rely on full and
complete information in the screening and diagnostic testing for other prenatal
diagnoses as well, including testing for trisomies, conducted with informed consent
through non-directive counseling.

Dated: February 19, 2020

Respectfully submitted,

*/s/ Chris A. Hollinger*
Chris A. Hollinger
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111-3823
Telephone: (415) 984-8700
Facsimile: (415) 984-8701
chollinger@omm.com

Ethan M. Scapellati
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
escapellati@omm.com

Hannah Dunham
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90072
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
hdunham@omm.com

*Counsel for Amici Curiae Biomedical
Ethicists*

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7)(B)(i) because it contains 3,011 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(b)(1).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14-point font.

Dated:  February 19, 2020          By: */s/ Chris A. Hollinger*
                                        Chris A. Hollinger

                                        *Counsel for Amici Curiae Biomedical*
                                        *Ethicists*

# CERTIFICATE OF SERVICE

I, Chris A. Hollinger, a member of the Bar of this Court, hereby certify that

on February 19, 2020, I caused a true and correct copy of

> Amici Curiae Brief Of Biomedical Ethicist In Support Of Plaintiffs-
>
> Appellees And Affirmance

to be sent via e-mail to the En Banc Coordinator of the United States Court of

Appeals for the Sixth Circuit for further processing through the appellate CM/ECF

system.

Dated:  February 19, 2020          By: */s/ Chris A. Hollinger*_____
                                        Chris A. Hollinger

                                        *Counsel for Amici Curiae Biomedical*
                                        *Ethicists*

# APPENDIX: *AMICI CURIAE*[1]

**George J. Annas, MD, MPH**
> *George J. Annas, JD, MPH*
> *William Fairfield Warren Distinguished Professor and Director*
> *Center for Health Law, Ethics & Human Rights*
> *Boston University School of Public Health, School of Medicine, School of Law*

**Jeffrey R. Botkin, MD, MPH**
> *Professor of Pediatrics and Medical Ethics*
> *Adjunct Professor of Human Genetics*
> *University of Utah*[25]

**Amy E. Caruso Brown, MD, MSc, MSCS**
> *Assistant Professor of Pediatrics, Bioethics and Humanities Center for Bioethics and Humanities*
> *Department of Pediatrics, Division of Pediatric Hematology/Oncology*
> *SUNY Upstate Medical University*

**Mara Buchbinder, PhD**
> *Associate Professor*
> *Department of Social Medicine*
> *University of North Carolina at Chapel Hill*

**Alyssa M. Burgart, MD, MA, FAAP**
> *Medical Director, LPCH Clinical Ethics*
> *Department of Anesthesiology, Perioperative, and Pain Management*
> *Lucile Packard Children's Hospital*
> *Stanford Center for Biomedical Ethics*
> *Stanford University*

**Jean Cadigan, PhD**
> *Associate Professor, Social Medicine*
> *Core Faculty, Center for Bioethics*
> *Research Director of Clinical Ethics Service,*

---

[25]   Institutional affiliations are provided for identification purposes only. The views expressed in this brief do not necessarily reflect the views of amici's institutions.

UNC Hospital Ethics Committee
*Member, Research Ethics Consultation Service, NC TraCS*

**Arthur L. Caplan, PhD**
*Drs. William F. and Virginia Connolly Mitty Professor of Bioethics*
*Department of Population Health*
*Director Division of Medical*
*Ethics NYU Grossman School of*
*Medicine*

**Julie Chor, MD, MPH**
*Assistant Professor of Obstetrics and Gynecology*
*University of Chicago*
*Assistant Director of the MacLean Center*

**Ellen Wright Clayton, MD, JD, MS**
*Craig-Weaver Professor of*
*Pediatrics Professor of Law*
*Professor of Health Policy*
*Vanderbilt University Medical Center and Law School*

**Colleen Denny, MD, FACOG**
*Assistant Clinical Professor*
*Department of Obstetrics and Gynecology*
*NYU School of Medicine*
*Bellevue Hospital*

**Jennifer E. deSante-Bertkau, MD, MBE**
*Assistant Professor of Pediatrics*
*Division of Hospital Medicine*
*Cincinnati Children's*

**Ezekiel J. Emanuel, MD, PhD**
*Diane v.S. Levy and Robert M. Levy University*
*Professor Chair, Department of Medical Ethics and*
*Health Policy*
*Co-Director, Healthcare Transformation Institute*
*University of Pennsylvania*

**Eric A. Feldman, JD, PhD**

Professor of Law
Professor of Medical Ethics & Health
Policy University of Pennsylvania

**Autumn Fiester, PhD**
Associate Professor
Associate Chair for Education & Training
Director, Penn Program for Clinical Conflict Management
Division of Medical Ethics
Department of Medical Ethics & Health Policy
Perelman School of Medicine
University of Pennsylvania

**Jill A. Fisher, JD**
Associate Professor of Social Medicine
UNC Center for Bioethics
University of North Carolina at Chapel Hill

**Stephanie Malia Fullerton, DPhil**
Professor
Department of Bioethics and Humanities
University of Washington Medicine

**Rupali Gandhi, MD JD**
Director, Pediatric Cardiology Fellowship Program
Director, Pediatric Ethics Advisory Committee
Advocate Children's Heart Institute
Advocate Children's Hospital

**Elena Gates, MD**
Professor Emerita
Department of Obstetrics, Gynecology and Reproductive Sciences
University of California, San Francisco

**Leonard H. Glantz, JD**
Professor Emeritus of Health Law, Bioethics and Human Rights
Boston University School of Public Health

**Kenneth W. Goodman, PhD**
Professor Emeritus of Health Law, Bioethics and Human Rights

*Boston University School of Public Health*

**Moti Gorin, PhD, MBE**
*Assistant Professor*
*Director of Jann Benson Ethics*
*Center Colorado State University*

**Peter D. Jacobson, JD, MPH**
*Professor Emeritus of Health Law and Policy*
*Director, Center for Law, Ethics, and Health*
*University of Michigan School of Public Health*

**Steven Joffe, MD, MPH**
*Emanuel and Robert Hart*
*Professor Chief, Division of*
*Medical Ethics*
*Department of Medical Ethics and Health Policy*
*Perelman School of Medicine, University of Pennsylvania*

**Eric Kodish, MD**
*Professor of Pediatrics, Oncology and Bioethics*
*Cleveland Clinic Lerner College of Medicine*
*Case Western Reserve University*
*Pediatrics Institute/Cleveland Clinic Children's Hospital*
*Cleveland Clinic*

**Daniel Kramer, MD, MPH**
*Assistant Professor of Medicine*
*Harvard Medical School*

**Emily Largent**
*Assistant Professor, Medical Ethics and Health Policy*
*Perelman School of Medicine*
*University of Pennsylvania*

**Holly Fernandez Lynch, JD, MBe**
*John Russell Dickson, MD Presidential Assistant Professor of*
*Medical Ethics*
*Assistant Faculty Director of Online Education*

Department of Medical Ethics and Health Policy
Perelman School of Medicine, University of Pennsylvania

**David Magnus, JD, PhD**
David Magnus, Ph.D. Director, Stanford Center for
Biomedical Ethics
Thomas A. Raffin Professor of Medicine and Biomedical
Ethics and Professor of Pediatrics, Medicine, and By
Courtesy of Bioengineering
Stanford University

**Karen J. Maschke, PhD**
Research Scholar
Editor, Ethics & Human Research
The Hastings Center

**Amy L. McGuire, JD, PhD**
Leon Jaworski Professor of Biomedical Ethics
Director, Center for Medical Ethics and Health Policy
Baylor College of Medicine

**Thomas Wm. Mayo, JD**
Altshuler University Distinguished Teaching Professor
Professor of Law, SMU/Dedman School of Law Professor
(adj.), Internal Medicine, UT-Southwestern Medical School
Of Counsel, Haynes and Boone LLP

**Maria W. Merritt, PhD**
Associate Professor
Johns Hopkins University Berman Institute of Bioethics and
Bloomberg School of Public Health

**Jon F. Merz, MBA, JD, PhD**
Associate Professor
Department of Medical Ethics & Health Policy
Perelman School of Medicine
University of Pennsylvania

**Michelle N. Meyer, MD**
Assistant Professor & Associate Director, Research, Ethics,

*Center for Translational Bioethics and Health Care Policy*
*Faculty Co-Director, Behavioral Insights Team,*
*Steele Institute for Health Innovation*
*Assistant Professor of Bioethics,*
*Geisinger Commonwealth School of Medicine*

**Steven H. Miles, MD**
*Professor of Medicine and Medical Ethics Emeritus*
*University of Minnesota*

**Stephanie Morain, PhD, MPH**
*Assistant Professor*
*Center for Medical Ethics and Health*
*Policy Baylor College of Medicine*

**Jonathan D. Moreno, PhD**
*David and Lyn Silfen University Professor*
*University of Pennsylvania*

**Kelly E. Ormond, MS, CGC, LGC**
*Professor, Department of Genetics*
*Co-Director, MS Human Genetics and Genetic Counseling*
*Faculty, Stanford Center for Biomedical Ethics*
*Stanford University*

**Lisa S. Parker, PhD**
*Dickie, McCamey & Chilcote Professor of Bioethics*
*Director, Center for Bioethics & Health Law*
*University of Pittsburgh*

**Govind Persad, JD, PhD**
*Assistant Professor*
*University of Denver Sturm College of Law*

**Reed E. Pyeritz, MD, PhD**
*William Smilow Professor of Medicine*
*Perelman School of Medicine*
*University of Pennsylvania*

**Steven J. Ralston, MD, MPH**

Chair, Department of OB/GYN
Pennsylvania Hospital

**Phillip M. Rosoff, MD, MA**
Professor Emeritus of Pediatrics and Medicine
Duke University Medical Center and School of Medicine
Adjunct Professor of Clinical Sciences,
NC State College of Veterinary
Medicine

**Mark Rothstein, JD**
Herbert F. Boehl Chair of Law and Medicine
Founding Director, Institute for Bioethics, Health Policy and
Law University of Louisville School of Medicine

**Harald Schmidt, PhD**
Assistant Professor, Department of Medical Ethics and Health
Policy Research Associate, Center for Health Incentives and
Behavioral Economics
Perelman School of Medicine,
University of Pennsylvania

**Alexander Smith, MD, MS, MPH**
Associate Professor of Medicine, Geriatrics and Palliative Medicine,
SFVAMC
University of California San Francisco

**Mildred Z. Solomon, EdD**
President, The Hastings Center
Professor of Global Health and Social Medicine
Harvard Medical School

**Ronit Y. Stahl, PhD, MA**
Assistant Professor
Department of History
University of California,
Berkeley

**Tom Tomlinson, PhD**
Professor and Director Emeritus

*Center for Ethics and Humanities in the Life Sciences*
*Michigan State University Chair, Ethics Committee*
*Sparrow Health System*

**Robert D. Truog, MD**
*Frances Glessner Lee Professor of Medical Ethics, Anaesthesia,*
*& Pediatrics*
*Director, Center for Bioethics, Harvard Medical*
*School Department of Global Health and Social*
*Medicine Senior Associate in Critical Care Medicine,*
*Department of Anesthesiology, Critical Care, and Pain Medicine,*
*Boston Children's Hospital*

**Yoram Unguru, MD, MS, MA**
*Division of Pediatric Hematology/Oncology*
*The Herman and Walter Samuelson Children's Hospital at Sinai*
*Chairman, Sinai Hospital Ethics Committee*
*Johns Hopkins Berman Institute of Bioethics*
*Assistant Professor, Johns Hopkins School of Medicine*

**Benjamin Wilfond, MD**
*Director, Treuman Katz Center for Pediatric Bioethics,*
*Seattle Children's Hospital and Research Institute*

**Matthew K. Wynia, MD, MPH, FACP**
*Professor of Medicine and Public Health Director,*
*Center for Bioethics and Humanities*
*University of Colorado*
*Anschutz Medical Campus*